**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

CIVIL ACTION NO. 09-103-DLB

ANTHONY J. ALLEN                                                                            PLAINTIFF

VS.                              <u>MEMORANDUM OPINION AND ORDER</u>

CHECKREDI OF KENTUCKY, LLC                                          DEFENDANT

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Plaintiff Anthony Allen alleges that Defendant Checkredi violated the Fair Debt Collection Practices Act (FDCPA) when it attempted to collect on a dishonored check by communicating to third parties that Plaintiff owed a debt, contacting third parties more than once, and failing to send Plaintiff timely written notice of the debt.  Defendant Checkredi responds that it is entitled to an affirmative defense because any FDCPA violations were not intentional and were the result of bona fide errors that occurred notwithstanding the maintenance of procedures reasonably adapted to avoid such errors.

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment on liability (Doc. # 30), and Defendant's Motion for Summary Judgment (Doc. # 35).  Oral argument on the motions was conducted on November 10, 2010.  Plaintiff Anthony J. Allen was represented by Steven C. Shane and Defendant Checkredi was represented by Boyd W. Gentry.  The motions having been fully briefed, this matter is now ripe for review. (Docs. # 30, 35, 39, 41, 42, 43).  For the reasons set forth below, both Plaintiff's and Defendant's motions will be **granted in part** and **denied in part**.

# I.    BACKGROUND

This case has it origins in Defendant's attempt to collect $44.79 from Plaintiff. Part of Defendant's business is a check guarantee service whereby it contracts with its customers, primarily merchants, to purchase checks returned for insufficient funds. Once Defendant owns the check, it attempts to collect the face value and a service fee from the check drawer.

On May 16, 2009, Plaintiff paid for a pizza with a check made out to Papa John's for $14.79. After the Bank of Kentucky dishonored the check for insufficient funds, Defendant bought the check from Papa John's pursuant to a standing contractual arrangement and set about collecting on the check.

The address listed on the dishonored check was 128 Garvey Ave., Elsmere, KY, 41018, Plaintiff's parents' address. Plaintiff had lived with his parents for about five years, but moved on November 29, 2008, shortly after he married Tina Allen. Plaintiff continued to use checks listing the Garvey Avenue address because he did not think it was worth buying new checks just to have an accurate address.

Defendant discovered on May 29, 2009 that the phone number associated with the Garvey Avenue address was 859-727-4264. Though Defendant's records indicate that it left a message at Plaintiff's "third number" on May 29, at that time it had only one phone number, not three, for Plaintiff.[1] A June 1 entry again indicated that Defendant left a message on an answering machine at the "third number." Acknowledging that it had only one phone number on record at this time for Plaintiff, Defendant's Vice President of

---

[1] Defendant's representative explained at her deposition that its records list phone numbers in a sequence: home, work, third, fourth.

Operations, Olivia Bartlett, conceded that the June 1 call was likely to the number ending in 4264, and the May 29 call might have been to the same number. Defendant's records show that it left a message at Plaintiff's "home" number on June 2, though the records do not indicate whether the home number was different than the "third number," or whether Defendant merely realized its error in the initial few entries and adjusted subsequent entries accordingly.[2]

Plaintiff's parents' and sister's testimony establish that, notwithstanding the confusion in Defendant's records, at least two of these early calls (made before June 3) were to the 4264 number. Plaintiff's father, James Allen, received the first call from Defendant on the evening of, or about, May 29, 2009. The details of that conversation are clouded by three different accounts.

James Allen's first account of that conversation is a June 8, 2009 written statement, which he adopted in his deposition, indicating that a Checkredi employee called seeking location information about Plaintiff regarding a debt he owed. James Allen's second account took place in April 2010, when he testified at his deposition that he received a call from someone looking for Plaintiff. Allen testified that he informed the caller that Plaintiff no longer lived at the address associated with the 4264 number, refused to give any further information, then told his wife about the call. Plaintiff's father was unable to recall any other details of the conversation during his deposition, including why the caller was calling. Finally, on June 17, 2010, in a sworn affidavit, James Allen stated that the caller on May 29, 2009 was "Anna from Checkredi," who said that she was "calling to try and collect on

---

[2] Defendant's record-keeping software is a "lock out" software. After an entry is made it cannot be altered or deleted, so errors cannot be corrected.

a check that bounced at or to Papa Johns."[3]  (Doc. # 30-7 ¶¶ 5-6).  In his affidavit, James

Allen recalled that he told the caller that Plaintiff did not live with him and refused to provide

additional information.  He also stated that he left a note for his wife describing the contents

of the call.

James Allen's affidavit is consistent with an email that Lorraine Allen (his wife and

Plaintiff's mother) sent Plaintiff on May 30, 2009—the day after the first call.  Lorraine Allen

affirmed at her deposition that she sent the email and that its contents came from a note

her husband wrote regarding a call he received from Defendant.  The subject of the email

was "BOUNCE CHECK" and read:  "Your Dad said that someone in a phone call yesterday

said you bounced a check.  Here's what he wrote down.  Check Ready; then Anna, Pappa

John's, 1-800-742-2925."  (Doc. # 25-1).

On June 2, Plaintiff's sister, Sarah Melius, answered the phone at her parents' house

on Garvey Avenue (the 4264 number), where she lived at the time.  She testified that there

was a recorded voice on the other end that requested, without identifying who it was calling

for, the listener to call an 800 number.  Melius called the number and the person who

answered requested information about her brother, Plaintiff.  Melius initially refused to

cooperate and pressed the person for more information; eventually the person revealed

that he was an employee of Defendant Checkredi and was seeking Plaintiff regarding a

debt he owed.  After learning this, Melius explained that Plaintiff no longer lived at 128

Garvey Avenue and gave the employee Plaintiff's home phone number.  Melius probed for

---

[3]  Defendant states in a footnote that it separately moved to strike James Allen's affidavit because it is inconsistent with his earlier statements.  (Doc. # 39 at 6 n.3).  Defense counsel conceded at oral argument that it did not file a separate motion to strike.  The Court is apprised of Defendant's argument and can discern inconsistencies in determining whether there is a genuine issue of material fact.

more information and Defendant's employee "finally did reveal that [Plaintiff] had written a bad check." (Doc. # 27 at 22, 41).

Defendant's records are consistent with Melius's deposition testimony. According to Defendant's records, Plaintiff's sister provided Defendant with Plaintiff's home phone number, 859-426-8264, on June 2, 2009. Melius wrote a statement on June 8, 2009, which she adopted in her deposition, and is also consistent with her deposition testimony. Her statement indicates that after pressing Defendant's employee, he told her that Plaintiff owed a debt.

On the morning of June 3, Plaintiff's wife, Tina Allen, awoke to a message being left on her answering machine by Defendant. Without listening to the message, she called back the number on the caller ID and learned that Defendant was trying to collect on a dishonored check that Plaintiff had written to Papa John's. Tina Allen relayed this information to her husband, who immediately called Defendant Checkredi. Defendant informed Plaintiff that he owed $14.79 for the dishonored check and a $30 service charge, for a total of $44.79. Plaintiff explained that he did not have the money but would be able to pay on June 15, when he was paid. Defendant's employee said that she could not halt the collection process, but agreed to put a note on the account reflecting their conversation.

Plaintiff's mother, Lorraine Allen, testified that in the two to three weeks following May 29, she and her husband received "a minimum of a dozen and up to at least 18" calls at their home. (Doc. # 25 at 9). Lorraine Allen testified that she answered most of the calls and "would just keep telling them Anthony does not live here." (Doc. # 25 at 10). During these conversations, Defendant's employees continued to ask for Plaintiff's contact information and Plaintiff's mother refused to provide it. This testimony is partially

corroborated by Melius, who stated that within two days of providing Defendant with Plaintiff's home phone number, she heard Plaintiff's mother tell a caller that she had already informed the caller that Plaintiff no longer lived there.

Defendant's records reveal that even after receiving Plaintiff's home number from his sister on June 2, it continued to call "home" and "work" numbers. A later entry in Defendant's records labeled the 8264 number as "home" and 4264 as "work." When pressed as to why Defendant called 4264 after Plaintiff's sister provided the 8264 number, Defendant's representative, Olivia Bartlett, testified that "as far as we knew, 4264 was still a valid number" because "who's to say [Plaintiff] didn't have two phone numbers." (Doc. # 23 at 109). Defendant's records indicate that it called Plaintiff's "work" number (apparently 4264) on June 4, 12, 15, 16, 22, 23, and 25, though its records also show that the calls on June 15 and 16 could not be completed because 4264 was no longer a valid number. Consequently, the meaning of the entries on June 22, 23, and 25, which indicate calls made and messages left at "work," is unclear.

Moreover, Defendant acknowledges that it uses a robotic caller, which automatically initiates calls and leaves messages. Though Defendant does not keep records of these automated calls, it conceded that such calls were likely made in this case. The record does not provide the content of these messages, which number(s) were called, nor how frequently such calls were made.

On June 11, 2009, Defendant mailed Plaintiff a letter informing him that he owed $44.79 and had a right to dispute the debt. The letter was mailed to 128 Garvey Avenue because, according to Defendant, it had not learned that Plaintiff did not live there any longer. Plaintiff, realizing that the Garvey address was the only one that Defendant had on

record, had asked his parents to let him know if anything arrived from Defendant; they did, and he picked up the letter on June 12 or 13.

Plaintiff contacted his attorney soon after receiving the letter from Defendant. Defendant testified that by June 26 it had received a letter from Plaintiff's attorney and, consequently, noted in its records not to call Plaintiff at either the 8264 or 4264 number. Ultimately, Plaintiff paid Defendant $44.79 on June 29, 2009 and initiated this action on July 7, 2009.

## II.    ANALYSIS

### A.    Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "[T]he court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the non-moving party." *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 361 (6th Cir. 2001). "When reviewing cross-motions for summary judgment, the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), it must produce evidence showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). The moving party will satisfy its burden if it can establish that "there is no

evidence underlying the non-moving party's case." *Univ. of Pittsburgh v. Townsend*, 542 F.3d 513, 522 (6th Cir. 2008). If, after reviewing the record as a whole, a rational fact finder could not find for the nonmoving party, summary judgement should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

### B. Alleged FDCPA Violations

Plaintiff brings this claim under the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 *et. seq.*, under which the Court has jurisdiction, 15 U.S.C. § 1692k(d). At oral argument, defense counsel conceded it was a "debt collector" for purposes of the FDCPA. The Court agrees, and the FDCPA regulates Defendant's activities.

Congress enacted the FDCPA "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). Because the Sixth Circuit treats the FDCPA as a strict liability statute, a single or technical violation by Defendant is sufficient to incur liability. *Edwards v. McCormick*, 136 F.Supp.2d 795, 800 (S.D. Ohio 2001) (citing *Frey v. Gangwish II*, 970 F.2d 1516, 1518-19 (6th Cir. 1992)).

### 1. Defendant communicated with third parties regarding Plaintiff's debt in violation of 15 U.S.C. §§ 1692b(2) and 1692c(b), but not § 1692b(3).

The FDCPA prohibits, with specific exceptions, a debt collector from communicating "in connection with the collection of any debt, with any person other than the consumer."

15 U.S.C. § 1692c(b).  Because Defendant communicated with Plaintiff's father, mother, and sister regarding Plaintiff's debt, Defendant will be found to have violated § 1692c(b) unless it is protected by the FDCPA's safe harbor provision, 15 U.S.C. § 1692b.

Section 1692b permits a debt collector to communicate with third parties for the limited purpose of acquiring location information about the consumer, but regulates the content of such communications.  Plaintiff alleges two violations of § 1692b.  First, Plaintiff alleges that Defendant violated § 1692b(2), which prohibits a debt collector from telling a third party that the consumer owes any debt.  Second, Plaintiff alleges that Defendant violated § 1692b(3), which prohibits a debt collector from communicating with a third party more than once, unless the third party requests additional communication or the debt collector reasonably believes that the third party's earlier response was erroneous or incomplete and that the third party subsequently has correct or complete location information.

> **a.    Defendant communicated to Plaintiff's father and sister that Plaintiff owed a debt in violation of §§ 1692b(2) and 1692c(b).**

Both parties move for summary judgment on Plaintiff's § 1692b(2) claim.  Section 1692b(2) provides:  "Any debt collector communicating with any person other than the consumer for the purpose of acquiring location information about the consumer shall not state that such consumer owes any debt."  Plaintiff alleges that Defendant violated this provision in communicating with Plaintiff's father on May 29, 2009 and Plaintiff's sister on June 2, 2009.

Defendant relies on James Allen's inability to remember the details of a conversation

9

that took place nearly a year before to contest Plaintiff's Motion for Partial Summary Judgment. In light of three corroborating accounts of James Allen's May 29, 2009 conversation with Defendant's employee, this isolated memory lapse does not raise a genuine issue of material fact as to whether Defendant communicated that Plaintiff owed a debt.

Defendant communicated with Plaintiff's father, James Allen, on or about May 29, 2009. (Docs. # 30-7 ¶¶ 4-5; 23-2). The first account of this communication is an email from Lorraine Allen to Plaintiff on May 30, 2009, the subject of which was "BOUNCE CHECK" and read: "Your Dad said that someone in a phone call yesterday said you bounced a check." (Doc. # 25-1). Over a week later, on June 8, 2009, Plaintiff's father completed a written statement in which he indicated, by checking a box, that someone had told him that Anthony Allen "allegedly owed a debt." (Doc. # 29-1). Plaintiff's father wrote in the statement that the caller did not give any name "other than [the] company to whom they were collecting for." (Doc. # 29-1) The first variation in James Allen's accounts came at his April 2010 deposition at which he testified that he was unable to recall details about the May 29 conversation, including why the caller was calling. (Doc. # 29 at 8). At one point during the deposition, James Allen said that he did not remember the caller telling him that Plaintiff had written a bad check; after reviewing his June 8 statement, however, Allen concluded that the caller told him that Plaintiff "owed somebody money for something." (Doc. # 29 at 26). Finally, on June 17, 2010, James Allen swore in an affidavit that the caller on May 29, 2009 was "Anna from Checkredi," who stated that she was "calling to try and collect on a check that bounced at or to Papa Johns." (Doc. # 30-7 ¶¶ 4-6). In his

affidavit, James Allen also stated that he left a note for his wife describing the contents of the call. (Doc. # 30-7 ¶ 11). Allen's written statement refreshed his recollection and, consequently, his earlier, isolated memory lapse does not raise a genuine issue of material fact in light of three accounts confirming that Defendant's employee communicated to James Allen that Plaintiff owed a debt.

There is also no genuine issue of material fact that Defendant violated § 1692b(2) on June 2, 2009 when its employee told Sarah Melius, Plaintiff's sister, that it was seeking Plaintiff to collect a debt he owed. Melius's June 8, 2009 written statement and April 2010 deposition paint nearly identical pictures. In her June 8 statement, Melius indicated that Defendant's employee told her Plaintiff owed a debt; further Melius "had to ask several questions before [Defendant's employee] would tell me more. They would never tell me where the debt was to." (Doc. # 27-1). In April 2010, Melius testified that during the phone call she was trying to figure out why Defendant wanted to locate her brother and was finally told that Plaintiff "had written a bad check." (Doc. # 27 at 22).

At oral argument, defense counsel conceded that Defendant does not dispute Melius's testimony regarding the contents of her conversation with its employee. Instead, defense counsel emphasized that Melius initiated the June 2 phone call. Absent authority demonstrating the relevance of this fact, Defendant's argument lacks merit. Moreover, Defendant's argument is disingenuous because Melius only called Defendant after receiving an automated call at her parents' home—where she lived—providing an 800 call-back number; the recorded message did not state who the message was for or what the call was about. Thus, Melius was only following Defendant's instructions when she called

Defendant back.

The court in *Dunaway v. JBC & Associates*, No. 03-73597, 2005 WL 1529574, at *5 (E.D. Mich. June 20, 2005) found similar evidence sufficient to award plaintiff summary judgment.  There, a third party testified that a debt collector called concerning a debt owed by the plaintiff, which the third party recorded in notes he took contemporaneous with the call.  *Id.*  Similar to this case, the debt collector's records confirmed that a call was made to the third party.  *Id.*  Because the debt collector could not offer any evidence to rebut the third party's testimony, the court found plaintiff had carried her burden.  *Id.*  Likewise, in this case, Plaintiff has offered uncontradicted testimony that Defendant violated the FDCPA in communications with Plaintiff's father and sister.   In response, just as in *Dunaway*, Defendant has only offered records confirming calls were placed to Plaintiff's parents' home and has failed to produce any evidence to refute Plaintiff's.

Three accounts of James Allen's May 29 conversation confirm that Defendant communicated to him that Plaintiff owed a debt in violation of the statute.  In opposition, Defendant relies exclusively on Allen's inability in his deposition to remember the details of that phone call, which took place nearly a year before.  Additionally, Defendant offers no evidence to dispute Melius's direct testimony that Defendant's employee informed her that Plaintiff owed a debt.  Consequently, the Court finds no genuine issue of material fact that Defendant violated § 1692b(2) during communications with third parties on May 29 and June 2, 2009.  Additionally, as discussed *supra*, Defendant's failure to comply with the statute's safe harbor provision also constitutes a violation of § 1692c(b), the FDCPA's general prohibition against communicating with third parties in connection with collecting

a debt.

> **b.** **Defendant's multiple communications with Plaintiff's mother do not violate § 1692b(3).**

Both parties move for summary judgment on Plaintiff's § 1692b(3) claim. Section 1692b(3) provides:

> Any debt collector communicating with any person other than the consumer for the purpose of acquiring location information about the consumer shall not communicate with any such person more than once . . . unless the debt collector reasonably believes that the earlier response by such person is erroneous or incomplete and that such person now has correct or complete location information.[4]

"Location information" includes "a consumer's place of abode and his telephone number at such place, or his place of employment." 15 U.S.C. § 1692a(7).

Defendant is entitled to summary judgment because no genuine issue of material fact exists as to whether it reasonably believed that all third parties' initial location information was incomplete, and that those third parties later had complete location information. This conclusion is bolstered by uncontroverted evidence that the location information provided by the third parties was actually incomplete and Defendant lacked complete location information at any time relevant to this litigation.

It is undisputed that Defendant received incomplete location information in its initial communications with third parties. Plaintiff's family members testified that they did not provide Plaintiff's complete location information to Defendant, either in their initial or later

---

[4] Plaintiff argues that "person" as used in § 1692b(3) must mean "phone number" because otherwise a debt collector could call the same number repeatedly in hopes of getting a different "person." (Doc. # 41 at 8). Defendant relies on the statute's plain language in rebuttal. (Doc. # 42 at 6). The Court need not adjudicate this dispute in disposing of the parties' motions.

communications. Plaintiff's mother and father expressly refused to provide any location information. (Docs. # 25 at 11-12; 29 at 8; 30-7 ¶¶ 8-9). Plaintiff's sister provided Plaintiff's home phone number, but testified that at the time of the communication she did not provide, or even know, Plaintiff's home address. (Doc. # 27 at 21-22).

Defendant reasonably believed that the third parties initially provided incomplete location information and that the third parties later had complete information. Plaintiff's father told Defendant that Plaintiff had moved and that it was not his "duty" to provide Plaintiff's location information, but that he would give Defendant's phone number to Plaintiff. (Doc # 29 at 8). Plaintiff's mother also informed Defendant that Plaintiff had moved, and refused to provide Plaintiff's location information. (Doc. # 25 at 9-11). That Plaintiff's parents never denied having his location information gave Defendant reason to believe that they had complete location information. Moreover, by agreeing in his May 29 phone call with Defendant to give Plaintiff a message, James Allen provided Defendant reasonable belief that he had Plaintiff's location information. That Sarah Melius knew Plaintiff's home phone number, but was uncertain of his new address because he had just moved, also gives rise to Defendant's reasonable belief that Plaintiff's sister subsequently would have his complete location information.

That Defendant had Plaintiff's correct home phone number on June 2, 2009 does not make ensuing communications with third parties illegal. Section 1692b expressly permits more than one communication with third parties in pursuit of complete "location information." Location information includes Plaintiff's "place of abode *and* his telephone number at such place." 15 U.S.C. § 1692a(7) (emphasis added). Plaintiff contends that

Defendant should have ceased pursuing his complete location information through third parties once Defendant had Plaintiff's home phone number and made contact with him. (Doc. # 41 at 10). Accepting Plaintiff's argument, however, would effectively replace § 1692a(7)'s use of "and" with "or," a revision the Court will not make.

The evidence establishes that Defendant did not have Plaintiff's correct home address and, therefore, did not have his complete location information at any time relevant to Plaintiff's claims. Though Plaintiff had not lived at 128 Garvey Avenue since November 2008 (Doc. # 33 at 56-57), Defendant sent its June 11, 2009 letter there because Defendant was "uncertain of Plaintiff's address" (Doc. # 35-2 ¶ 5) and Plaintiff "never told [Defendant] anything different." (Doc. # 23 at 121). Plaintiff acknowledged that he chose not to provide Defendant his location information, but instead told his parents to be on the lookout for a letter mailed from Defendant to Garvey Avenue. (Doc. # 33 at 58). Even as late as September 8, 2009, Defendant's records list Garvey Avenue as Plaintiff's address. (Doc. # 23-3).

Finally, Plaintiff emphasizes that Defendant's repeated calls to the Garvey Avenue phone number continued even after Plaintiff's parents repeatedly asked Defendant to stop calling. But Plaintiff does not explain how Defendant's refusal to comply with these requests violates § 1692b(3)'s narrow proscription. Other sections of the FDCPA protect against harassment and abuse of "any person" in connection with debt collection. *See, e.g.,* 15 U.S.C. § 1692d (prohibiting "conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt").

Viewed in the light most favorable to Plaintiff, the evidence demonstrates that Defendant did not have Plaintiff's complete location information at any time relevant to Plaintiff's claim, and at all times Defendant reasonably believed that Plaintiff's father, mother, and sister had complete location information. Because there is no genuine issue of material fact that Defendant complied with § 1692b(3)'s strictures, Defendant's Motion for Summary Judgment is granted as to Plaintiff's § 1692b(3) claim.

> **2.     Defendant failed to send written notice within five days of its initial communication with Plaintiff in violation of 15 U.S.C. § 1692g(a).**

Next, Plaintiff alleges that Defendant failed to send him written notice within five days of their initial communication as mandated by 15 U.S.C. § 1692g(a), which provides: "Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, . . . send the consumer a written notice."[5]

It is undisputed that Defendant's initial communication with Plaintiff took place on June 3, 2009. (Docs. # 23-2; 23 at 100; 32 at 37-39). It is also undisputed that Defendant sent the first written notice to Plaintiff's parents' address more than five days later, on June 11, 2009. (Docs. # 23-2; 23-4; 23 at 101). Defense counsel asserted at oral argument that it sent the notice late because Plaintiff and his family refused to provide Plaintiff's correct address. Yet Defendant fails to explain why it nevertheless sent notice on June 11, 2009 to Garvey Avenue—the address it had on record for Plaintiff on June 3, 2009 when the initial communication took place.

---

[5] Plaintiff concedes that the written notice contained the statutorily required content. (Doc. # 30 at 12).

Further, Defendant has provided no authority to suggest § 1692g(a) is inapplicable, or its five-day requirement tolled, when a debt collector does not possess the consumer's correct address. Consistent with the Sixth Circuit's directive, the Court is bound to apply the FDCPA's plain language. *See Frey*, 970 F.2d at 1518 (applying the plain language of § 1692g(a) notwithstanding "much common-sense appeal" in arguments for an alternate decision). Consequently, there is no genuine issue of material fact that Defendant violated § 1692g(a) and Plaintiff is entitled to summary judgment on this claim.

### 3. Defendant is not entitled to the bona fide error defense provided in 15 U.S.C. § 1692k(c).

Defendant argues, both in response to Plaintiff's motion and as grounds for its own, that it is entitled to the bona fide error defense and is thus shielded from liability for any FDCPA violations. For Plaintiff to prevail on his motion, he must establish that Defendant cannot prove its affirmative defense, even when the evidence is viewed in the light most favorable to Defendant.

As previously determined, Plaintiff has established three violations of the FDCPA: Defendant (1) communicated to Plaintiff's father that Plaintiff owed a debt on May 29, 2009 in violation of §§ 1692b(2) and 1692c(b); (2) communicated to Plaintiff's sister that Plaintiff owed a debt on June 2, 2009 in violation of §§ 1692b(2) and 1692c(b); and (3) failed to send Plaintiff written notice within five days of its initial communication on June 3, 2009 in violation of § 1692g(a). The bona fide error defense must apply to each violation to absolve Defendant of liability.

The bona fide error defense is available where "the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c).

### a.    Defendant's violations were intentional.

The Supreme Court in *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 130 S.Ct. 1605 (2010) addressed the previously unsettled question of whether, for the purposes of the bona fide error defense, a debt collector's violation is intentional if the debt collector performs an intentional act, with no intent to violate the FDCP. *See Johnson v. Riddle*, 443 F.3d 723, 728 (10th Cir. 2006) (questioning "whether it is the general intent to collect a debt or whether it is the specific intent to violate the FDCPA" that violates the "not intentional" element of the bona fide error defense). Four years before *Jerman*, the Tenth Circuit in *Johnson* answered that the intentional prong of the bona fide error defense is a subjective test and "a violation is unintentional . . . if the debt collector can establish the lack of specific intent to violate the Act." *Id.* In support, the court observed that the bona fide error defense covered mistakes of law, "and it would make little sense to require a debt collector to negate general intent for an error of law defense." *Id.*

Finding the Tenth Circuit's rationale persuasive, and recognizing a split in its district courts, the Sixth Circuit determined that the bona fide error defense applied to a violation resulting from an attorney's mistaken legal conclusion regarding an FDCPA requirement. *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 538 F.3d 469, 478 (6th Cir. 2008). In determining that the bona fide error defense applied to mistakes of law, the Sixth Circuit

affirmed its prior precedent that "the debt collector must only show that the violation was unintentional, not that the communication itself was unintentional." *Id.* at 477 (quoting *Lewis v. ACB Bus. Servs., Inc.,* 135 F.3d 389, 402 (6th Cir. 1998)).

On appeal, the Supreme Court summarized the dispute as "whether a 'violation' resulting from a debt collector's misinterpretation of the legal requirements of the FDCPA can ever be 'not intentional.'" *Jerman*, 130 S.Ct. at 1611. The Supreme Court reversed the Sixth Circuit, holding that the bona fide error defense does not cover a mistake of law. The Court reasoned that "[o]ur law is . . . no stranger to the possibility that an act may be 'intentional' for the purposes of civil liability, even if the actor lacked actual knowledge that her conduct violated the law." *Id.* at 1612.[6]

Following *Jerman*, the intentional prong of the bona fide error defense can no longer be whether a defendant specifically intended its actions to violate the FDCPA. As the petitioner successfully argued in its Supreme Court brief, a violation that is not intentional could mean two things: "It could mean that the defendant did not intend to commit the act that violated the statute" or it "could refer to a defendant who knows exactly what she is doing but does not realize that her intentional act will violate the statute." Brief for Petitioner at 14, *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA,* 130 S.Ct. 1605 (2010) (No. 08-1200), 2009 WL 3043969 at *14. By definition, only the latter standard could cover a mistake of law. *Id.* In holding that the bona fide error defense does not apply to a mistake of law, the Supreme Court indicated that "not intentional" covers only a

_____

[6] The Court did not disturb Sixth Circuit precedent that procedural or clerical errors are covered by the bona fide error defense, *Jerman*, 538 F.3d at 473 (citing *Smith v. Transworld Sys., Inc.,* 953 F.2d 1025 (6th Cir. 1992)), and acknowledged that certain factual errors are also protected. *Jerman,* 130 S.Ct. at 1607, 1614, 1621.

defendant who did not intend to commit the act that violated the FDCPA. *See Bassett v. I.C. Sys., Inc.* 715 F.Supp.2d 803, 813 (N.D. Ill 2010) (interpreting *Jerman* to mean that "a debt collector's conduct may be intentional even if he lacked the actual knowledge that his conduct violated the FDCPA" and consequently, "the bona fide error defense under Section 1692k(c) only applies to procedural or clerical errors"); *McNall v. Credit Bureau of Josephine Cnty., Inc.*, No. 07-3075, 2010 WL 3306899, at *3 (D. Or. Aug. 19, 2010) (finding the bona fide error defense unavailable because the defendant "made a conscious decision not to report Plaintiff's debt as disputed" and this failure was not an unintended factual or clerical mistake).

Applying *Jerman* to this case, the evidence, viewed in the light most favorable to Defendant, establishes that Defendant's violations of the FDCPA were intentional. First, Defendant's act of orally communicating that Plaintiff owed a debt to Plaintiff's father was intentional; whether Defendant intended to violate the FDCPA is immaterial under *Jerman*. A review of Defendant's memoranda and the record reveal no evidence that Defendant's communication was not intentional.

Defendant's communication to Plaintiff's sister on June 2, 2009 that Plaintiff owed a debt was also intentional. Defendant contends that this disclosure was not intentional because Plaintiff's sister pressed its employee for the information. Defendant emphasizes that "Plaintiff's sister continued to try and gather more information" from its employee and that "she had to pry the information from" Defendant's employee, who did not "simply volunteer the information." (Doc. # 39 at 4-5). Defendant concludes that Melius's "statement that, '[t]hey wanted things from me that they weren't willing to give out,' clearly

shows that any disclosure was unintentional." (Doc. # 39 at 5).

Defendant's argument is insufficient to establish that its disclosure of prohibited information was not intentional. Defendant suggests that Melius's persistence overbore its employee's will, resulting in an unintentional disclosure. The record demonstrates that Defendant's employee initially resisted providing information, but ultimately yielded. (Docs. # 27-1; 27 at 22-25). Though it remains unclear why Defendant's employee acquiesced, his initial resistance reveals that he did not unintentionally or accidentally disclose the information. By contrast, the evidence shows that Defendant's employee was aware that he should not provide Melius the information she requested, but did so anyway.

The FDCPA's nondisclosure provisions require Defendant to protect Plaintiff's privacy. Congress enacted the FDCPA to end abusive collection practices, such as "disclosing a consumer's personal affairs to" third parties. *Fed. Home Loan Mortg. Corp. v. Lamar*, 503 F.3d 504, 513 (6th Cir. 2007) (quoting *Jacobson v. Healthcare Fin. Servs.*, 434 F.Supp.2d 133, 138 (E.D.N.Y. 2006)). That Plaintiff's sister asked for personal information does not affect Defendant's statutory responsibility to protect Plaintiff's privacy.

Finally, Defendant's failure to send Plaintiff timely written notice in violation of § 1692g(a) was intentional. Defendant contends that it did not send the notice because Plaintiff made it impossible to obtain his home address. (Doc. # 39 at 10-11). This argument is unavailing. Defendant had 128 Garvey Avenue listed as Plaintiff's address at all times relevant to this litigation. On this basis, Defendant regularly called the number associated with the Garvey Avenue address. Defendant's representative even testified that, notwithstanding assertions to the contrary from Plaintiff's mother (Doc. # 25 at 10), it

had not learned that Plaintiff did not live at 128 Garvey Avenue.  (Doc. # 23 at 120-21).

Nonetheless, Defendant waited eight days after its initial communication with Plaintiff to

mail the required written notice to the Garvey Avenue address.  Defendant offers no

explanation as to why eight days was the watershed moment.  Absent an adequate

explanation or evidence as to why Defendant waited eight days after its initial

communication with Plaintiff to send notice to an address that it had on file all along, the

Court finds Defendant's violation intentional.

Viewed in the light most beneficial to Defendant, Defendant's violations on May 29,

June 2, and in failing to timely provide written notice, were intentional under § 1692k(c)

such that Defendant is not entitled to the bona fide error defense.

### b. Defendant did not maintain procedures reasonably adapted to avoid the errors that occurred in this case.

The record further establishes that Defendant did not maintain procedures

reasonably adapted to avoid these errors, which the bona fide error defense requires.  15

U.S.C. § 1692k(c).  "The inquiry into whether a debt collector's procedures are reasonable

is, by its nature, fact-intensive, and should therefore typically be left to the jury."  *Akalwadi*

*v. Risk Mgmt. Alternatives, Inc.*, 336 F.Supp.2d 492, 504 (D. Md. 2004) (internal quotes

omitted) (quoting *Gill v. Kostroff*, 82 F.Supp.2d 1354, 1360 (M.D. Fla. 2000); *Narwick v.*

*Wexler*, 901 F.Supp. 1275, 1282 (N.D. Ill. 1995)).  Summary judgment remains appropriate,

however, when the evidence leads to only one conclusion.  Moreover, unlike the intent

element of the bona fide error defense, the reasonable procedures element is an objective

inquiry.  *Richburg v. Palisades Collection LLC*, 247 F.R.D. 457, 467 (E.D. Pa. 2008).

In *Jerman*, the Supreme Court explained that the statutory phrase, "procedures reasonably adapted to avoid any such error," is "more naturally read to apply to processes that have mechanical or other such 'regular orderly' steps to avoid mistakes—for instance, the kind of internal controls a debt collector might adopt to ensure its employees do not communicate with consumers at the wrong time of day."  130 S.Ct. at 1614 (quoting Webster's Third New International Dictionary (1976)).  The bona fide error defense "does not require debt collectors to take every conceivable precaution to avoid errors; rather, it only requires reasonable precaution."  *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 539 (7th Cir. 2005).  But, as the plain language of the statute and caselaw make evident, the procedure in question must be reasonably adapted to avoid the particular error from which defendant seeks to escape liability.  15 U.S.C. § 1692k(c); *Johnson*, 443 F.3d at 729.  Applied to this case, then, the inquiry is whether Defendant has procedures that are reasonably adapted to (1) avoid communicating to a third party that a consumer owes a debt and (2) ensure notice is mailed to consumers within five days of Defendant's initial communication with them.

Defendant's memoranda rely on conclusory assertions and tenuous inferences, first to argue that it had procedures in place, and second, that its procedures were reasonable. Defendant primarily relies on the self-serving affidavit of Olivia Bartlett, its Vice President of Operations, in which she testifies that Defendant had procedures in place to prevent "[a]ny violations" it may have committed in this case.  (Doc. # 35-2 ¶ 7).

Defendant also points to Sarah Melius's initial difficulty in obtaining prohibited information from Defendant's employee to prove the existence and reasonableness of a

procedure to ensure its employees do not disclose prohibited information to third parties. "The employee's conduct in this regard [initially deflecting Melius's questions] demonstrates that Defendant has a procedure that it does not reveal the existence of a debt." (Doc. # 42 at 4). It does not. It merely indicates that at some point Defendant instructed its employees not to give out certain information. And indeed, at oral argument defense counsel argued that its procedure was to instruct its employees not to give out prohibited information. If anything, that Defendant's employee nevertheless gave Melius prohibited information suggests that Defendant did not provide its employees training or a procedure sufficient to deal with a third party's request for prohibited information. To approve Defendant's procedure would obviate the FDCPA's requirement that the procedure be reasonable and tailored to the violation in question; a debt collector could rely on its general instruction to employees not violate the FDCPA as a "procedure" reasonably adapted to prevent all violations. "Don't do it" is hardly a procedure, and certainly not a "reasonable" one.

Defendant's single piece of evidence to prove its procedure for timely sending written notice to a consumer is the form letter that it sends to consumers, which includes the statutorily required information and disclosures. (Docs. # 35 at 12; 35-2 at 3-4) The letter, with nothing more, does not show that Defendant had a procedure for ensuring that it was sent at all—and certainly not that it was sent within the five day limit. Even assuming such a procedure did exist, the letter does not suggest that the procedure was reasonable.

Though the Court need look no further than the evidence the parties direct it to, *Beatty v. United Parcel Serv.*, 267 F.Supp.2d 823, 829 (S.D. Ohio 2003) (citing *InterRoyal*

*Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989)), an independent review of the record provides Defendant additional, though ultimately insufficient, support. In her deposition, Bartlett explained that Defendant provides its new employees "a printout of the entire statute" (the FDCPA) to read. (Doc. # 23 at 141, 144). After the employees familiarize themselves with the statute, and before they make their first call, they have a conversation with a collection manager during which they discuss pertinent provisions of the FDCPA. (Doc. # 23 at142-43). Employees who are unable to understand or comply with the FDCPA are fired. (Doc. # 23 at 144). Bartlett confirmed that this was the extent of its training because it could not afford outside training. (Doc. # 23 at 143-46). Defendant also acknowledged that it did not have an attorney with whom it could regularly consult with questions regarding how to interpret the FDCPA. (Doc. # 23 at 147). The record is devoid of any other evidence remotely approaching a procedure to avoid the errors that occurred in this case.

Defendant's primary "procedure"—namely, providing a copy of the FDCPA to its employees and directing them to comply with it—reveals that it does not have specific procedures to avoid specific errors. That is, Defendant's procedure to ensure consumers receive timely notice is the same procedure to ensure it does not disclose prohibited information to third parties is the same procedure to ensure it does not call third parties more than once. This procedure is not reasonable to avoid violating a statute that the Sixth Circuit has called "extraordinarily broad," *Frey*, 970 F.2d at 1521, and "ever changing." *Jerman*, 538 F.3d at 477 (quoting, in agreement, the district court's opinion). Indeed, Defendant offers no evidence of procedures (reasonable or otherwise) to avoid the specific

errors in this case: when a consumer's sister requests prohibited information, or it remains unsure of a consumer's home address five days after its initial communication with that consumer.

Defendant's procedures are substantially less comprehensive and structured than the procedures other courts have endorsed as "reasonable." In *Jerman*, the Sixth Court determined that defendant law firm's procedures were reasonable. 538 F.3d at 477, *rev'd on other grounds*, 130 S.Ct. 1605 (2010). There, the law firm designated its senior principal to be responsible for ensuring compliance with the FDCPA. *Id.* In that capacity, the principal attended conferences and seminars, subscribed to trade publications, distributed relevant cases to the attorneys, provided all employees (attorneys and non-attorneys) with the firm's FDCPA Procedures Manual, and conducted a mandatory meeting discussing FDCPA developments at least twice a year. *Id.* Defendant Checkredi has none of these procedures.

Defendant's procedures are as haphazard as the procedure the court found lacking in *Edwards*, 136 F.Supp.2d at 801-02. In that case, the defendant would give information to his secretary, who would put it in letters to be mailed to consumers; defendant candidly acknowledged that sometime he would double-check his secretary's work, but other times he would simply sign the letters. *Id.* Because defendant only double-checked the letters "when the spirit moved him," the *Edwards* court found that defendant's procedures "completely failed to satisfy" the reasonableness element of the bona fide error defense. *Id.*

The procedure in *Edwards* is more extensive and reasonable than Defendant's. Defendant in *Edwards* had a system to ensure its letters were reviewed for accuracy by two people, though it frequently failed to follow this system. By contrast, Defendant here has only a general policy of directing its employees not to violate the FDCPA, and a conversation with a collections manager before they make their first collections call. This is not a procedure reasonably adapted to ensure its employees do not reveal private information and timely send notice to consumers.

Because the evidence cannot establish by a preponderance of evidence that Defendant's (1) violations were not intentional and (2) its procedures were reasonably adapted to avoid these errors, Defendant's Motion for Summary Judgment on its bona fide error defense is denied.

## III.   CONCLUSION

For the reasons set forth herein, **IT IS HEREBY ORDERED** that:

1.     Plaintiff's Motion for Partial Summary Judgment on liability (Doc. # 30) is **GRANTED** as to his §§ 1692b(2), 1692c(b), and 1692g(a) claims and **DENIED** as to his § 1692b(3) claim;

2.     Defendant's Motion for Summary Judgment (Doc. # 35) is **GRANTED** as to Plaintiff's § 1692b(3) claim and **DENIED** as to Defendant's § 1692k(c) bona fide error defense;

3.     Plaintiff's Motion to Voluntary Dismiss Claims (Doc. # 45) in ¶ 17, subsections (a), (c), (d), (f), (g), (h), and (I) of his Complaint (Doc. # 1) is

**GRANTED**, except that the claims are **dismissed with prejudice**.

This 17th day of November, 2010.



Signed By:
David L. Bunning
United States District Judge

G:\DATA\ORDERS\Cov09\09-103 Cross MSJs[1].wpd